**DI JUB LEASING CORP., Dianne Pellecchia, and Susan Jubert, Plaintiffs,**

v.

**The UNITED STATES of America; the Secretary of the Department of the Treasury; the Commissioner of Customs, United States Customs Service; Regional Commissioner of Customs, United States Customs Service, New York Region; Area Director of Customs, United States Customs Service, Port of Newark, Defendants.**

**Court No. 80–11–00038.**

United States Court of International Trade.

Dec. 5, 1980.

Serko & Simon, New York City (David Serko, Margaret Sachter and Steven Wolosky, New York City, of counsel), for plaintiffs.

Alice Daniel, Asst. Atty. Gen., Washington, D. C. (Joseph I. Liebman, Atty. in Charge, Field Office for Customs Litigation, Saul Davis, trial attorney, New York City), for defendants.

MEMORANDUM AND ORDER ON PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' CROSS-MOTION TO DISMISS.

NEWMAN, Judge:

This is an action to review a decision of the Commissioner of Customs revoking the customhouse cartman's license of plaintiff Di Jub Leasing Corporation ("Di Jub"). Subject matter jurisdiction is asserted by plaintiffs under 28 U.S.C. § 1581(i)(1) and (4). The jurisdictional predicate, as we shall see *infra*, raises an issue of first impression.

Presently before the Court for consideration are plaintiffs' application for a preliminary injunction and defendants' cross-motion to dismiss for lack of subject matter jurisdiction.

Extensive oral argument was heard by the Court on November 10, 1980 in connection with plaintiffs' motion under Rule 65, brought on by an order to show cause.

## JURISDICTION

■ Initially, we consider the threshold jurisdictional issue presented by defendants' cross-motion to dismiss. As noted *supra*, plaintiffs predicate jurisdiction on the provisions of 28 U.S.C. § 1581(i)(1) and (4), viz., a "residual grant of jurisdictional authority" to this Court under the Customs Courts Act of 1980, effective November 1, 1980, P.L. 96–417, 94 Stat.1727, H.R.Rep.No.96–1235, 96th Cong. 2d Sess. 47, U.S.Code Cong. & Admin.News 1980, p. 7088. Although these residual provisions relied on by plaintiffs are clear on their face, Congressional intent that they be given broad application in cases arising out of our international trade laws is evident from the legislative history of the Customs Courts Act.

Over the years, complex jurisdictional issues have been raised in cases arising out of our international trade laws due to the ill-defined division of jurisdiction between this Court's predecessor, the United States Customs Court, and the federal district courts.[1] This division of jurisdiction resulted in "in-

---

[1] The jurisdictional statutes concerning the Customs Court granted that Court exclusive jurisdiction to entertain the suits defined by those statutes, while 28 U.S.C. § 1340 granted residual jurisdiction to the district courts to entertain any action not within the exclusive jurisdiction of the Customs Court. This division of jurisdiction resulted in a confusing jurisdictional morass, with the all too frequent result that parties would institute suits in the district courts to find, perhaps after long delay and an appeal, that they had chosen the wrong court. See H.R.Rep.No.96–1235, at 29–30, and cases there cited.

consistent judicial decisions with litigants proceeding cautiously when choosing a forum for judicial review". H.R.Rep.No.96–1235, 19, U.S.Code Cong. & Admin.News 1980, p. 7090. In the instant case, we are confronted again with the question of whether plaintiffs are properly before this Court.

The recently enacted Customs Courts Act of 1980 creates a comprehensive system for the judicial review of civil actions arising out of international trade law, and greatly expands the status, jurisdiction and powers of the former United States Customs Court (renamed on November 1, 1980, the United States Court of International Trade). One of the major objectives of the legislation was to eliminate the confusing division of jurisdiction over international trade law disputes between the Customs Court and the federal district courts. Thus, in its report accompanying the bill which became the Customs Courts Act of 1980 (H.R. 7540) the House Committee on the Judiciary stated (H.R.Rep.No.96–1235, at 27–28, U.S.Code Cong. & Admin.News 1980, p. 7098):

> H.R. 7540 provides for significant and much-needed reform and clarification of the statutes governing the status, jurisdiction and powers of the United States Customs Court. This legislation seeks to accomplish several major goals;
>
> \*   \*   \*   \*   \*   \*
>
> 3. The re-emphasis and clarification of Congress' intent that the expertise and national jurisdiction of the Court of International Trade and the Court of Appeals for International Trade, Patents and Trademarks be exclusively utilized in the resolution of conflicts and disputes arising out of the tariff and international trade laws, thereby eliminating the present jurisdictional conflicts between these courts and the federal district and appellate courts;

In expanding the jurisdiction of the Customs Court, Congress granted the newly named Court[2] exclusive jurisdiction over certain specified actions, as enumerated in 28 U.S.C. § 1581(a) through (h), and provided a broad residual grant of jurisdictional authority in § 1581(i). The purpose of the residual jurisdictional provisions in § 1581(i) is stressed in the House Judiciary Committee's Report (H.R.Rep.No.96–1235, at 47, U.S.Code Cong. & Admin.News 1980, p. 7118):

> The purpose of this broad jurisdictional grant is to eliminate the confusion which currently exists as to the demarcation between the jurisdiction of the district courts and the Court of International Trade. This provision makes it clear that all suits of the type specified are properly commenced only in the Court of International Trade. The Committee has included this provision in the legislation to eliminate much of the difficulty experienced by international trade litigants who in the past commenced suits in the district courts only to have these suits dismissed for want of subject matter jurisdiction. The grant of jurisdiction in subsection (i) will ensure that these suits will be heard on their merits.

With the purposes and objectives of the residual jurisdictional provisions in mind, we shall proceed to determine whether this action is properly before the Court under § 1581(i)(1) and (4), as urged by plaintiffs. These provisions read:

> (i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)–(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or, the officers, that arises out of any law of the United States providing for—
>
> (1) revenue from imports or tonnage.
>
> \*   \*   \*   \*   \*   \*

---

2. Congress renamed the United States Customs Court the United States Court of International Trade, which new name "more accurately describes the court's clarified and expanded jurisdiction and its new judicial functions relating to international trade". H.R.Rep.No.96–1235, at 20, U.S.Code Cong. & Admin.News, 1980, p. 7091.

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

Specifically, plaintiffs contend that this action contesting the administrative revocation of a customhouse cartman's license "arises out of" the "administration and enforcement" of a law providing for revenue from imports. I agree.

The Customs regulations providing for the licensing of customhouse cartmen are set forth in 19 CFR §§ 112, *et seq.*, and these regulations are authorized by 19 U.S.C. §§ 66, 1551a, 1565 and 1624. The regulations describe the role of the cartman in international trade as the transportation of goods or merchandise, on behalf of the Government or importers, within the limits of a port, for the purposes of storage in warehouse and/or subsequent examination of the merchandise by customs officers, either in premises under Customs custody, or under the custody of importers. Further, the regulations require that customhouse cartmen be licensed by the District Director, and be bonded.

Plaintiffs have submitted as exhibits attached to their memorandum of law an application form for a customhouse cartman's or lighterman's license, together with the form of bond required for that license (Customs Form 3855). An examination of these documents discloses that the primary objective of licensing and bonding cartmen and lightermen is to secure the revenue from imports on which customs duties have not yet been paid. In this connection, it has been noted that the undertaking form provides that in the event of failure to safely transport and deliver the merchandise to the appropriate customs officer, the cartman is liable for certain sums of liquidated damages. Significantly, the damages for loss of a shipment on which duty is owed are "an amount equal to the duties" on such merchandise. Moreover, if a shipment is delivered to the ultimate consignee or owner of the merchandise before it has been released by Customs, the liquidated damages specified in the bond are the duty owing plus twenty-five percent of that duty. It should be noted that a bond is a condition precedent to obtaining a cartman's license.

Customs Collection District No. 10 (New York), through which passes more imported merchandise than any other district in the United States, includes the ports of New York, and Newark and Perth Amboy, New Jersey. Imported merchandise in Customs custody, on which many millions of dollars in duty are owed to the Government, must be transported within and away from that area from port to port or to bonded warehouses. Obviously, before duties are paid, imported merchandise cannot be released to the consignee, or to carriers and truckers without *protection of the revenue from imports.* Hence, all persons in possession of such goods must be bonded, from the importer who has an Immediate Delivery Permit to the licensed customhouse cartman who picks up the merchandise at the pier, so that the Government has recourse under the bonds for the payment of duties. Essentially, the revenue from imports is thereby protected.

In accordance with 19 U.S.C. § 1551a (Pub.Resol. 108 of June 19, 1936), "The Secretary of the Treasury * * * is * * * authorized, when it appears to him to be in the interest of commerce, and notwithstanding any provision of law or regulations requiring the transportation of imported merchandise be by a bonded common carrier, to permit such [imported] merchandise which has been entered and examined for customs purposes to be transported by bonded cartmen or bonded lightermen between the ports of New York, Newark, and Perth Amboy, which are included in Customs Collection District Numbered 10 (New York) * * * *".

Additionally, Customs regulations, Part 19, on "Transportation in Bond and Merchandise in Transit", includes a section 19 CFR 18.1(b), authorizing the District Director to:

* * * permit merchandise entered and examined for customs purposes to be transported in bond between the ports

named in the resolution by bonded cartmen or lightermen duly qualified in accordance with the provisions of part 112, *if the collector [District Director] is satisfied that the transportation of such merchandise in this manner will not endanger the revenue.* [Emphasis added.]

Significantly then, the regulations providing for a cartman's license implement the District Director's authority.

In sum, the present action contesting the revocation of Di Jub's cartman license is within this Court's exclusive jurisdiction under 28 U.S.C. § 1581(i)(1) and (4) because the revocation of a cartman's license pursuant to the customs regulations is so intertwined with and directly related to the *administration and enforcement* of the laws providing for revenue from imports. I have no doubt that, by the residual grant of jurisdictional authority in § 1581(i), Congress intended to assure comprehensive review in this Court of a broad spectrum of administrative actions arising out of our international trade laws, including those laws concerning the suspension or revocation of various customs licenses. Were the opposite true, it would frustrate a major Congressional goal of the Customs Courts Act of 1980 to "eliminate the confusion which currently exists as to the demarcation between the jurisdiction of the district courts and the Court of International Trade." H.R.Rep.No.96–1235, at 47, U.S. Code Cong. & Admin.News 1980, p. 7118.

Although generally, jurisdictional statutes are to be strictly construed,[3] the legislative history of the residual jurisdictional provisions in section 1581(i) obviously evinces Congressional intent that these special provisions shall be accorded a *broad* construction. H.R. 6394, the predecessor of H.R. 7540 (which became the Customs Courts Act of 1980), added a new section 1581(i) to Title 28, U.S.C., granting residual

jurisdiction to this court. This section granted the Court jurisdiction over those civil actions which arise directly out of an import transaction and involve one of the many international trade laws. Significantly, in the proposed section 1581(i) of H.R. 7540, as amended, the specific listing of statutes in the residual provisions was eliminated in favor of a broader "generic approach". Congress eschewed the listing of specific statutes in the residual provisions because it feared such listing "would result in an inadvertent omission of a statute, thereby creating further confusion in the minds of international trade law litigants". H.R.Rep.No.96–1235, 33–34, U.S. Code Cong. & Admin.News 1980, p. 7104. More, the language in proposed section 1581(i), as contained in section 201(a) of H.R. 6394, "arises directly from an import transaction", was deleted. Under proposed section 1581(i) of H.R. 7540, as amended, "the Court of International Trade has jurisdiction over those civil actions which arise out of a law of the United States pertaining to international trade". H.R.Rep.No.96–1235, at 34, U.S.Code Cong. & Admin.News 1980, p. 7104.

Defendant urges that the explicit granting to this Court of jurisdiction over the denial, revocation or suspension of a customhouse broker's license pursuant to 28 U.S.C. § 1581(g) indicates that Congress did not intend to empower this Court to review a cartman's license revocation proceeding under section 1581(i). In support of this argument, defendant relies upon the well-known principle of statutory construction: *expressio unius est exclusio alterius.*

I am clear that the specific jurisdictional authority granted to this Court under section 1581(g) does not indicate Congressional intent to exclude from this Court's jurisdiction the review of cartmen's license revocation proceedings. The following legislative

---

**3.** *United States v. Boe*, 64 CCPA 11, 15–16, C.A.D. 1177, 543 F.2d 151 (1976). While defendants rely upon the well-settled principle that the United States cannot be sued in the courts without its consent (viz., a waiver of sovereign immunity), defendants do not argue that no judicial review at all is available for the

revocation of a cartman's license. Indeed, the revocation of a cartman's license was in fact reviewed in a federal district court (*Tempo Trucking and Transfer Corporation v. Dickson*, 405 F.Supp. 506 (E.D.N.Y.1975)) prior to the enactment of the Customs Courts Act of 1980.

history of section 1581(g) plainly shows why Congress explicitly provided for jurisdiction in the case of customhouse broker's licenses (H.R.Rep.No.96–1235, 32–33, U.S.Code Cong. & Admin.News 1980, p. 7103):

> Under section 641 of the Tariff Act of 1930, the United States courts of appeals have jurisdiction to review a decision by the Secretary of the Treasury to deny, revoke or suspend a customhouse broker's license. In keeping with the overall purpose of the Customs Courts Act of 1980, H.R. 6394 transferred jurisdiction over these actions to the United States Court of Appeals for International Trade, Patents and Trademarks (See section 401(c)(1) of H.R. 6394).
>
> This transfer of jurisdiction met with some resistance from the representatives of the customhouse brokers. They testified that provisions in H.R. 6394 imposed an undue economic hardship on customhouse brokers by requiring them to travel to Washington, D. C., for a hearing before the Court of Appeals for International Trade, Patents and Trademarks. It was the opinion of the National Customs Brokers & Forwarders Association that "the existing right of an aggrieved customhouse broker to have his complaint heard without undue expense in his own territory" should be preserved, in particular by permitting concurrent jurisdiction between the Court of Appeals for International Trade, Patents and Trademarks and the United States courts of appeals. [Footnote omitted].
>
> In an effort to protect the rights of an aggrieved customhouse broker and at the same time preserve the goal of uniformity of jurisdiction over civil actions involving the international trade laws, the Subcommittee suggested granting exclusive jurisdiction over these actions to the United States Court of International Trade. None of the witnesses, including the A.B.A. and the Justice Department, objected to this suggestion. In fact, the National Customs Brokers & Forwarders Association stated that:
>
> > Since the new Court of International Trade (now the United States Customs Court) is set up to hold, and has in the past held, hearings from time to time at various ports in the country, while the new Court of Appeals for International Trade, Patents and Trademarks has not, and does not regularly do so, our present objection . . . would be removed."
>
> Accordingly, the Subcommittee adopted an amendment vesting exclusive jurisdiction over these civil actions in the Court of International Trade, now found in proposed section 1581(g), as contained in section 201 of H.R. 7540.

Inasmuch as Congress intended to transfer jurisdiction over customhouse brokers license proceedings from the Courts of Appeals under 19 U.S.C. § 1641(b) to this Court, it is perfectly logical that under the circumstances delineated in the House Report the desired transfer of jurisdiction was explicitly effectuated in 28 U.S.C. § 1581. Despite the specific provisions in section 1581(g) concerning customhouse brokers licenses, the legislative history of the Customs Courts Act of 1980 suggests no Congressional intent whatever to *limit* this Court's jurisdiction respecting review of license proceedings to those involving customhouse brokers. I can perceive of no reason why Congress would grant this Court jurisdiction in the case of customhouse brokers' licenses, and intend to withhold jurisdiction respecting cartmen's licenses. On the contrary, the Judiciary Committee commented (H.R.Rep.No.96–1235, 46 U.S.Code Cong. & Admin.News 1980, p. 7116):

> * * * In keeping with the *underlying policy of this legislation [H.R.7540] to establish a uniformity of jurisdiction of civil actions involving the tariff and international trade laws*, the Committee believes it is appropriate to repose jurisdiction over these cases [customhouse broker's licenses] in the Court of International Trade. * * * [Emphasis added.]

The rationale expressed above by the House Committee on the Judiciary for reposing jurisdiction in the Court of International Trade of actions involving custom-

house brokers' licenses is equally apposite to actions contesting the revocation of a cartman's license.

Since the primary purpose of licensing customhouse cartmen is for the protection of the governmental revenue from imports, this action "arises out of" the "administration and enforcement" with respect to a law of the United States providing for revenue from imports within the purview of 19 U.S.C. § 1581(i)(1) and (4). Consequently while the doctrine of *expressio unius est exclusio alterius* would plainly exclude cartmen's license proceedings from 28 U.S.C. § 1581(g), that doctrine does not preclude this Court's jurisdiction to review the revocation of such licenses pursuant to the *residual grant* of jurisdiction in section 1581(i).

For the foregoing reasons, defendants' cross-motion to dismiss for lack of subject matter jurisdiction is denied.

### PRELIMINARY INJUNCTION

We turn to the issue of whether plaintiffs have made the requisite showing for the issuance of a preliminary injunction.

The factual background pertinent to plaintiffs' application for a preliminary injunction set forth below is disclosed by the verified complaint and affidavits submitted by plaintiffs, which for present purposes we will accept in their most favorable light.

Di Jub is a New Jersey Corporation that for the past six years has been engaged in the operation of a trucking concern at Weehawken, New Jersey, its principal place of business. The corporation was issued a customhouse cartman's license (No. 168) by the Newark Area District Director of Customs on December 19, 1975 that authorizes Di Jub to receive and transport bonded merchandise. In connection with the operation of its trucking business, Di Jub engages some forty owner-truckers.

Dianne Pellecchia is president and majority stockholder (75% stock ownership) of Di Jub;

Susan Jubert (Dianne's daughter by a prior marriage) is Di Jub's vice-president and secretary-treasurer and minority stockholder (25% stock ownership);

Ralph Pellecchia (Dianne's husband) served, until July 2, 1979, as Di Jub's vice-president and chief operating officer.

In an affidavit executed by Ralph Pellecchia on November 5, 1975 respecting an application of Di Jub to the United States Customs Service for a cartman's license, Mr. Pellecchia swore that: "The financial funds for the creation of Di Jub were derived exclusively from the resources of myself and my wife Dianne Jubert". However, in Dianne Pellecchia's affidavit executed on November 10, 1980 in support of the application for a temporary restraining order and order to show cause, she averred: "the financial resources to start the plaintiff corporation came from my personal funds that predated my marriage to Ralph Pellecchia" (paragraph 7). Clearly, these two critical sworn statements are contradictory.

On July 2, 1979, Mr. Pellecchia was sentenced to prison for a term of 2½ years and fined $10,000 upon a judgment of conviction entered in the United States District Court, District of New Jersey, on three counts of aiding and abetting the filing of fraudulent corporate income tax returns for the fiscal years 1975, 1976 and 1977. Pellecchia's conviction was based upon a plea of guilty before the District Court on April 26, 1979. Mr. Pellecchia resigned as an officer of Di Jub shortly prior to his conviction and sentencing.

Thereafter, on November 1, 1979, Di Jub received a notice of a proposal to revoke its cartman's license by the Area District Director of Customs at Newark for violation of certain Customs regulations. The notice informed Di Jub that the proposed revocation was the result of the guilty plea and conviction of its Chief Operating Officer, Ralph Pellecchia, of three counts of filing false corporate income tax returns on behalf of Di Jub (26 U.S.C. § 7206).

On November 8, 1979, Di Jub filed a notice of appeal from the proposed revocation, and an administrative hearing was

held on April 29, 1980, before Charles D. Lewis, Jr., Regional Counsel, Bureau of Alcohol, Tobacco and Firearms. Mr. Lewis found that Di Jub had violated 19 CFR § 112.30(a)(9); and as grounds for revocation, the hearing officer concluded that the filing of false corporate income tax returns (Form 1120S) for fiscal years 1975, 1976 and 1977 constituted negligence, dishonest or deceptive practices, or carelessness in the conduct of Di Jub's business. Accordingly, on July 11, 1980, Lewis recommended in his decision that the customhouse cartman's license of Di Jub be revoked.

By letter dated October 7, 1980, the Commissioner of Customs notified Di Jub that its license was revoked (effective October 28, 1980) and made the following findings:

1. That the conduct of the hearing and procedural steps, preliminary and subsequent thereto, complied with the pertinent statutes and regulations.

2. That Ralph Pellecchia served as Vice-President and Chief Operating Officer of Di Jub Leasing Corporation in late 1975 and throughout 1976, 1977, and 1978.

3. That Ralph Pellecchia had resigned as an officer of the Di Jub Leasing Corporation prior to his conviction of income tax fraud involving the corporation.

4. That Di Jub Leasing Corporation filed false income tax returns for 1975, 1976, and 1977 and that such action constitutes a negligent, dishonest or deceptive practice or carelessness in the conduct of its business.

Subsequently, the effective date of the revocation was extended until November 12, 1980. (In fairness to the stockholders of Di Jub, I desire to stress that nowhere in the papers before the Court is there any indication of any misguided conduct or impropriety on their part as affecting Di Jub's operation of its business.)

On November 10, 1980, pursuant to plaintiffs' application for an Order to Show Cause, and after hearing extensive oral argument by counsel for the respective parties, this Court issued a temporary restraining order ("TRO"), staying the revocation of Di Jub's license until November 20, 1980. Thereafter, on November 20, 1980 and again on November 30, 1980, the TRO was extended by order of this Court in accordance with plaintiffs' applications.[4]

As provided by 28 U.S.C. § 1585, "The Court of International Trade shall possess all the powers in law or equity of, or as conferred by statute upon, a district court of the United States". And it should be stressed that under 28 U.S.C. § 2643 this Court, with certain limitations, is expressly empowered to grant injunctive relief.

The courts have long recognized that, fundamentally, preliminary injunctive relief is an "extraordinary remedy", *Asher v. Laird*, 475 F.2d 360, 362 (D.C.Cir.1973) and should be granted only upon a clear showing that the moving party is entitled to the relief requested. *Flintkote Co. v. Blumenthal*, 469 F.Supp. 115, 126–27 (N.D.N.Y. 1970), *aff'd* 596 F.2d 51 (2d Cir. 1979).

In the oft-cited *Asher* case, the Court of Appeals succinctly observed (475 F.2d at 362):

> The granting of such extraordinary relief [a preliminary injunction] is a matter of the trial court's discretion as guided by a standard consisting of the following familiar factors: (1) Has the plaintiff made a strong showing that it is likely to prevail on the merits of the appeal?; (2) Has the plaintiff shown that without such relief it would be irreparably injured?; (3) Would the issuance of the injunction substantially harm other parties interested in the proceedings?; (4) Where lies the public interest?

*Cf. Washington Metropolitan Area Transit Commission v. Holiday Tours Inc., et al.*, 559 F.2d 841 (D.C.Cir.1977); See also Re, *Cases and Materials in Equity and Equitable Remedies* (1975), Chapter XIX, Section 1.

After full consideration of the factors enumerated above in *Asher*, in conjunction with all the facts and circumstances ad-

---

4. These orders were issued on the condition that the plaintiff corporation shall not employ Ralph Pellecchia as an employee, agent, or officer, or appoint him as a director.

duced by plaintiffs, I conclude that plaintiffs' application for the extraordinary relief sought should be denied.

Plaintiffs' memorandum of law submitted in support of their application for a preliminary injunction sets forth numerous claims on the merits. These claims include:

(1) The Customs Regulations under 19 CFR 112.30(a)(9) and the statement of findings in the Commissioner of Customs' letter of revocation are constitutionally void for vagueness.

(2) The revocation of Di Jub's Customhouse Cartman's License without a specific finding as to the degree of culpability is arbitrary, capricious and an abuse of discretion.

(3) The revocation of Di Jub's Customhouse Cartman's License is unlawful under the requirements of the Administrative Procedure Act, as no legal finding was made and no grace period was granted, as required by 5 U.S.C. 558.

(4) The conviction of Ralph Pellecchia under 26 U.S.C. 7206(2) for aiding and abetting the filing of false tax returns cannot be imputed to Di Jub Leasing Corporation.

(5) Di Jub did not belong to Ralph Pellecchia and should not be penalized solely because of his guilty plea.

(6) There is no substantial evidence to support the decision of the Commissioner of Customs.

(7) The decisions of the Commissioner of Customs and the Hearing Officer involved an impermissible taint by combination of adjudicatory and investigatory functions.

(8) This revocation action amounts to a violation of the plea agreement with Ralph Pellecchia and is thus contrary to law.

(9) The applicable regulation, 19 CFR 112.30(a)(9), is properly addressed to the conduct of the business of the license holder.

(10) Di Jub's Customhouse Cartman's License is a property right of which it is being deprived without due process of law.

(11) Customs procedures in the revocation of Di Jub's Customhouse Cartman's License do not meet with the requirements of due process.

I have given careful consideration to plaintiffs' claims, and based upon the arguments and authorities submitted, I am unable to find that plaintiffs have made the requisite showing that they are likely to prevail on the merits.

Additionally, plaintiffs have failed to demonstrate that without a preliminary injunction they will be irreparably injured, for the following reasons: While there is no doubt that loss of a license to conduct a particular business can be shown to result in irreparable injury, here, plaintiffs have utterly failed to submit any evidence by affidavit, or otherwise, showing either the annual dollar amount of Di Jub's Customs cartage business or even the percentage of the corporation's income from such business. The revocation of its cartman's license only precludes Di Jub from transporting merchandise under Customs jurisdiction, but the corporation can continue its non-Customs trucking business. It further appears that the forty persons plaintiffs assert would be out of work as a result of the denial of a preliminary injunction are in the main "owner-operators" who are not plaintiffs' "employees". These owner-operators can continue trucking merchandise elsewhere if Di Jub is unable to fill the gap left by the loss of its Customs cartage business. There has been no corroborating evidence whatsoever from any of these owner-operators—and most certainly the Court cannot speculate—that they will be "out of work" as asserted by plaintiffs' counsel.

Under all the facts and circumstances, I find that plaintiffs have failed to sustain their burden respecting the irreparable injury factor set forth in *Asher v. Laird, supra.*

For the reasons stated hereinabove, it is ORDERED:

1. That defendants' cross-motion to dismiss for lack of subject matter jurisdiction is denied;

2. That plaintiffs' application for a preliminary injunction *pendente lite* is denied;

3. That defendant shall serve an answer to the complaint within ten (10) days after the service of this order.

4. That the temporary restraining order, as extended on November 30, 1980, is dissolved.