**BAR BEA TRUCK LEASING CO., INC.,**
**Bar-Mar Warehouse Co., Inc.,**
**Plaintiffs,**

v.

**The UNITED STATES, et al.,**
**Defendants,**

and

**Midlantic National Bank/South,**
**Intervenor.**

**Court No. 82–4–00582.**

United States Court of
International Trade.

Aug. 11, 1982.

Fredric J. Gross, Haddonfield, N. J., for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, New York City (John J. Mahon, Asst. Branch Director and Saul Davis, New York City), for defendants.

Elson, Aibel & Cole, New York City, for intervenor.

NEWMAN, Judge:

The prelitigation history of this dispute resembles a jigsaw puzzle comprising many half-hidden and missing pieces, but nevertheless adequate to discern for determination of the several legal issues presented.

In this action, plaintiffs Bar-Mar Warehouse Co., Inc. (BMW) and Bar Bea Truck Leasing Co., Inc. (BBT), two separate New Jersey corporations, seek declaratory and injunctive relief prohibiting Customs from interfering with their conduct of a Customs cartage business under a Customhouse license (CHL) 1777 issued to a third related corporation, Bar-Mar Trucking Co., Inc. (BMT), which latter corporation is not a party to these proceedings.

Specifically, plaintiffs request the following relief:

(1) A judgment declaring Bar-Mar Warehouse Co., Inc. to be the holder of CHL 1777.

(2) An injunction permanently preventing defendants from suspending, cancelling, revoking or nullifying CHL 1777 on the basis of any past revocation of its corporate authority by the State of New Jersey.

(3) An injunction permanently preventing defendants from suspending, cancelling, revoking or nullifying CHL 1777 on the basis of its use by Bar Bea Truck Leasing Co., Inc. during the period of time up to and including 14 days after notice is received of Customs' final disposition of BBT's license application, and without prejudice to any requested extension thereof should Customs reject that application.[1]

---

1. Plaintiffs' complaint alleges additional causes of action relating to the seizure of a vehicle and to the alleged tortious acts of certain employees of the Customs Service.

## FACTUAL BACKGROUND

Some 16 years ago—on February 7, 1966 —Customs issued CHL 1777 to BMT, a cartman doing business in the Newark District. However, within two years, and without apparent reason Customs began to accept yearly bonds under CHL 1777, posted on behalf of BMW, a completely independent corporation, albeit comprised of the same officers and shareholders of BMT.

The dominant force behind BMT and BMW is Anthony F. Gallagher, who testified at length that in 1967 unnamed Customs officials prevented Gallagher from obtaining a license for more than one corporation owned by the same principals. No Customs regulation, past or present, was called to this Court's attention which prevents such licensing, and the incumbent Customs officials deny knowledge of the existence of such a policy. Thereafter, and over the succeeding 14 years, BMW conducted its cartage business as though it had been issued CHL 1777 with the full knowledge and consent of Customs.

By 1976, plaintiff BBT, the third closely related corporation controlled by Gallagher, was engaged in Customs cartage, also using CHL 1777. Indeed, BBT negotiated various government contracts which required a Customhouse license predicated upon CHL 1777. When BBT requested its own license, but was informed by Customs that the application process would entail an investigation and take some time, Gallagher asserted to a Customs officer that his third company, BBT, would continue to operate under BMW's CHL 1777. Clearly, by this time and by this course of events the license was considered by all parties to be held by BMW. It is not disputed by the government that in the 14 years of hauling bonded cartage, plaintiffs have been penalized for merely one small fine ($25.00) for a technical infraction of Customs' rules and regulations.

We thus find this scenario: since 1976 BBT, without a license, carted bonded cargo throughout the Newark area until March, 1982. As inexplicably as it had accepted BMW in the place of BMT as the holder of CHL 1777 and with as little formality, Customs by a letter to BMW dated March 22, 1982 notified BMW that CHL 1777 had been determined by Customs to be "null and void". Additionally, Customs demanded the return of CHL 1777 and various documents issued under the license and seized a BBT truck purporting to operate under the license.

Significantly, Customs' determination that BMW's license was null and void was not predicated upon any Customs regulation nor upon a revocation proceeding in accordance with 19 CFR 112.30. Rather, Customs simply posited that CHL 1777 had become null and void as a consequence of BMW's failure to pay New Jersey corporate franchise taxes and the consequent repeal of its corporate charter, leaving the corporate entity nonexistent under state law. See NJSA 54:11–1 and 54:11–2. Plaintiffs assert that BBT merely followed BMW's footsteps in reliance upon the advice of Customs officials allegedly given in 1967 limiting Mr. Gallagher to only one license.

Upon notice of Customs' action, BMW paid the arrearages in franchise taxes and requisite penalties, and its corporate charter was reinstated retroactively by the State of New Jersey.

At this juncture, BBT filed an application for its own Customhouse license. After a period of some four months, BBT's application was denied by Customs subsequent to the conclusion of the hearing and submission on the pending motions.

## PROCEDURAL HISTORY

Following Customs' refusal to grant BMW a hearing concerning the nullification of CHL 1777, or to honor the New Jersey reinstatement of BMW's corporate charter, plaintiffs filed this lawsuit in the United States District Court for the District of New Jersey seeking preliminary and permanent injunctive relief, return of the seized truck, and compensatory and punitive damages sounding in tort from the United States and the individually named defendants. In view of the jurisdiction of the

Court of International Trade over actions contesting the revocation of a cartman's license (See: this Court's holding in *Di Jub Leasing Corp. v. United States*, 1 CIT 42, 505 F.Supp. 1113 (1980), the New Jersey District Court transferred the entire matter to the Court of International Trade on April 28, 1982. The transfer order was entered pursuant to 28 U.S.C. § 1584(a) without prejudice to retransfer those causes of action outside the jurisdiction of this Court back to the New Jersey District Court when appropriate. During the course of proceedings in this Court, the government moved, without opposition, to retransfer those claims of the plaintiffs relative to the seized truck and the alleged tortious conduct by the United States and the individually named defendants to the New Jersey District Court upon jurisdictional grounds.

On April 28, 1982 plaintiffs applied to my colleague, Judge Boe, assigned to the Motion Part on that date, for a Temporary Restraining Order (TRO) prohibiting Customs from interfering with the conduct of their cartage business under CHL 1777. Judge Boe granted the TRO over the government's opposition and set this matter down for a hearing on a preliminary injunction before the Motion Part Judge presiding on May 6, 1982. Prior to that hearing, the Midlantic National Bank/South was granted permission to intervene in this action to contest ownership of the seized truck tractor.

Thereafter, as Motion Part Judge in May, I was faced with several matters requiring immediate resolution.[2] The ten witnesses who testified in this case were forced by the immediacy of urgent Court business to appear at different intervals, thereby lengthening an already complicated proceeding.

This hearing focused on the purported nullification of CHL 1777 by Customs in March, 1982 as it affected both plaintiffs, and as raised by the motions for a preliminary injunction and for declaratory judgment. Post hearing briefs were received by

July 9, 1982 in which the parties indicated their agreement that the issue of the nullification of CHL 1777 is ripe for resolution on the merits. The nullification issue is, of course, of common concern to the parties, and obviously judicial review of such administrative action falls within the jurisdiction of the Court. The TRO has been continued in force—and without objection. Subsequent to the hearing and submission of the case, plaintiff BBT filed an amendment under Court Rule 15(a) to the Fourth Cause of Action set forth in the complaint to challenge Customs' denial of BBT's application for a license. Essentially, BBT's "amended complaint" seeks a trial relative to Customs' determination that BBT's financial position and past unauthorized use of CHL 1777 require that its license application be denied. In response, defendants have moved to dismiss the new cause of action and amended complaint for lack of jurisdiction and untimeliness.

## CONTENTIONS OF THE PARTIES

Plaintiff BMW claims that it is the holder of CHL 1777, as consistently recognized by Customs until the revocation of its corporate charter by the State of New Jersey. BMW further contends that under New Jersey law its corporate charter was reinstated retroactively after payment of delinquent fees and taxes, and therefore CHL 1777 is not null and void by operation of New Jersey law, as asserted by defendants.

Plaintiff BBT maintains that it should be permitted to operate under CHL 1777 on the theory of equitable estoppel, and requests that the government be enjoined from interfering in its business, at least until its license application, filed on March 24, 1982, is acted upon by Customs. Upon receiving notice of the denial of its application for a Customhouse license, BBT filed its so-called amended complaint contesting the denial and now seeks a trial on the new cause of action presented. Additionally, plaintiffs have requested that the temporary restraining order remain in force until the resolution of the new cause of action.

---

**2.** Among others, *United States Cane Sugar Refiners Association v. Block, et al.*, 3 CIT ——, 544 F.Supp. 883 (1982). *Aff'd* C.A.D., 683 F.2d 399 (CCPA 1982) on an expedited appeal.

Defendants insist that neither of the plaintiffs is entitled to use CHL 1777, which was actually issued to a third corporation (BMT), despite the unchallenged dominion and control over CHL 1777 exercised by BMW. More, defendants argue that BMW's corporate reinstatement under New Jersey law did not affect the prior nullification of CHL 1777. Respecting BBT's reliance on equitable estoppel, defendants argue that such theory is inapplicable to the United States; and in any event, plaintiffs have failed to establish the requisite elements for an estoppel. Finally, regarding plaintiffs' new cause of action contesting the denial of BBT's license application, defendants moved on July 15, 1982 to dismiss the new cause of action on the ground that the Court lacks jurisdiction and has moved to strike the supplemental complaint for untimeliness. Plaintiffs responded to the Government's motions on July 30, 1982; defendants replied on August 9, 1982.

## OPINION

### I.

■ At the threshold, we consider the issue of whether BMW is the holder of CHL 1777. On that score, it is irrefutable that for a period exceeding 14 years Customs uniformly recognized and treated BMW as the licensee under CHL 1777. Year after year, for these 14 years, bonds were posted in BMW's name. Upon request of BMW, numerous CHL 1777 employee identification cards were issued to BMW employees. Indeed, Customs maintained its entire official file for CHL 1777 under BMW's name; and the notification letter sent by Customs on March 22, 1982 declaring CHL 1777 to be null and void was addressed to BMW as the license holder. In point of fact, nothing in the record remotely indicates that Customs ever challenged, or even questioned, BMW's status as the licensee under CHL 1777 over the period of 14 years. Although Mr. Gallagher's testimony that a Customs official prevented him from obtaining a license for more than one corporation is not directly corroborated, the significant fact remains that Customs made no objection to BMW's open and notorious use of CHL 1777 originally issued to BMT during such 14 year period of *de facto* licensure to BMW. It is inconceivable that the government was unaware of or misled as to the true facts concerning BMW's use of CHL 1777.

An analysis of Customs' official file for CHL 1777 is enlightening. In addition to bearing the label, "Bar-Mar Warehouse Co.", the file contains—by actual count—twenty five communications from Bar-Mar to Customs on Bar-Mar letterheads relative to licensing requirements. Moreover, at least twenty-one third party communications concerning bonding companies and freight operations were written to Customs in connection with BMW's bonded cartage business. Most significantly, Customs has on at least six occasions written to BMW expressly recognizing it as the licenseholder. For example, a 1975 letter from Customs to BMW begins: "Gentlemen: *Your* Customhouse License No. 1777 is due for renewal..."; and in 1979, "*Your* surety bond anniversary date is April 16, 1979. In order that *your* Customhouse license may continue..." (Emphasis added). The overriding fact is that every indicia of ownership consistently leads to the inescapable fact that BMW exercised dominion and control over CHL 1777, all with the explicit and continuous monitoring by Customs. Applying the concrete facts to abstract principles: the short of the matter is that BMW is the *de facto* licenseholder of CHL 1777—a status recognized by Customs since 1968.

### II.

We turn to the purported nullification of BMW's license.

As noted, *supra*, in a letter to BMW dated March 22, 1982, Customs, upon learning of the repeal of BMW's corporate charter, declared CHL 1777 to be "null and void." According to defendants, the predicate for the nullification of BMW's license was the notification by the New Jersey Department of State that BMW's corporate charter had been voided as of March 1, 1977 for nonpayment of franchise taxes. See NJSA 54:11–1 and 54:11–2. The March 22, 1982

nullification letter required the return of (1) Customhouse license number 1777; (2) all truck drivers' identification cards; and (3) a letter from BMW stating that all markings pertaining to CHL 1777 had been removed from the company's equipment.

Upon receipt of Customs' nullification letter, BMW then asked for a hearing as authorized by Customs regulation 19 CFR 112.30 in cases of license revocation.

In reply on April 14, 1982 Customs informed BMW that the March 22, 1982 nullification letter was not a notice of revocation, but simply a demand for the return of CHL 1777 inasmuch as BMW was no longer in existence. Customs vigorously insists that CHL 1777 automatically expired by operation of New Jersey law and was not "revoked".

As we have observed, BMW subsequently paid the arrears in delinquent taxes, etc., and was notified by New Jersey officials that the BMW corporate charter was reinstated. See NJSA 54:11–5. Customs, nevertheless, adheres to its position that CHL 1777 remains null and void and that the reinstatement of BMW's corporate charter by New Jersey is irrelevant.

█ Plaintiff BMW urges that the purported nullification of CHL 1777 by Customs on the basis that the company's charter had been declared void by the State of New Jersey, is contrary to New Jersey law as expressed in *J. B. Wolfe, Inc. v. Salkind*, 3 N.J. 312, 70 A.2d 72 (1949). Plaintiffs insist—and correctly—that *J. B. Wolfe* stands for the proposition that the reestablishment of a repealed corporation when the unpaid taxes (which caused the revocation) are paid, is retroactive and validates all prior acts of the corporation during the period the corporate charter was null and void. In *Wolfe*, plaintiff sued to recover a commission, and defendant resisted on the ground that plaintiff's corporate charter had been revoked seven years earlier. The unanimous New Jersey Supreme Court held that the effect of repeal was mere suspension of corporate powers until the corporation has complied with the revenue raising provisions of the statute. Chief Judge Van-

derbilt, speaking for the highest New Jersey Court, pointedly stated that when "default has been cured by subsequent compliance * * * reinstatement relates back to the date of the proclamation [of repeal] and validates corporate action taken in the interim". (70 A.2d at 76.)

To illuminate this area of New Jersey law, the Second Circuit Court of Appeals has adopted the reasoning of the New Jersey Court of Chancery in *Reade v. Broadway Theatre Co. of Long Branch*, 99 N.J. Eq. 282, 132 A. 477 (N.J.Ch.1926), and said in *United States v. Indian Hill Farm Inc.*, 255 F.2d 282, 284 (2d Cir. 1958):

> "[New Jersey] Corporations whose charters are forfeited for non payment of taxes 'are not dead' but merely 'asleep'; they are only in a 'state of coma' from which they may be revived."

See also the old and respected finding in *Held v. Crosthwaith*, 250 F. 613 (2d Cir. 1919).

Similarly pertinent to BMW's corporate situation is the *Reade* court's comment that "it requires the exercise of no miraculous power to revive them. The procedure for their revival is plainly indicated by statute" (132 A. at 480).

█ Customs, having invoked New Jersey law with reference to the status of CHL 1777, is bound by nothing less than the full effect of the New Jersey statutes and rulings concerning the status of the licensee—BMW—itself. Absent any relevant preemptive federal statute or regulation to the contrary, state law must control on questions of corporate law. *Cf. Vulcan Materials Co. v. United States*, 446 F.2d 690 (5th Cir. 1970), wherein the Internal Revenue Service had promulgated regulations explicitly overriding state corporate law. Here, Customs had no overriding regulations.

The conclusion ineluctably follows that the retroactive reinstatement of BMW's corporate status by the State of New Jersey retroactively reinstated BMW's authority under CHL 1777, and consequently there was no permanent forfeiture of that license by operation of New Jersey law, as urged by Customs.

### III.

■ On the other hand, plaintiff BBT has utterly failed to demonstrate that Customs accepted it in the position of the licenseholder. Nor can I agree with plaintiffs' unfounded assertion that BBT enjoys derivative rights to CHL 1777 on the theory of equitable estoppel.

Of paramount importance is the fact that in 1977 Mr. Gallagher actually inquired of Customs respecting the procurement of a license for BBT; and after being fully advised by Customs regarding the procedure for obtaining a new license, Gallagher deliberately declined to file an application. These facts are clearly pointed up by the testimony of Mr. George A. Stanley, a Customs inspector stationed at Bayonne, New Jersey.

Mr. Stanley was an application examiner from the latter part of 1975 to January 1978, and is a graduate of Brooklyn College. As a major part of his duties, Stanley processed applications for Customhouse licenses for truckmen. It appears that BBT, in an undated letter, wrote to Customs inquiring as to the "time frame for completing this request for a new license" (Plaintiff's exhibit 21). By a subsequent telephone call, Gallagher stated to Stanley that Gallagher needed a new license immediately, and Stanley advised Gallagher that BBT and/or Gallagher must be investigated and that the investigation could take from six to eight weeks. Thereupon, Gallagher informed Stanley that he required a new license at once, and would not wish to await an investigation. In sum, after being informed as to the length of time required to process an application, Gallagher decided that he would not apply for a new license. This is corroborated by Stanley's handwritten note on plaintiff's exhibit 21 that "It was decided by Mr. Gallagher that a new license wasn't necessary after I explained the matter with him. The company will continued [sic] to operated [sic] with Bar-Mar Whse. CHL # 1777 only. 4–20–77".

In reaching my determination, it should be stressed that I contemporaneously stated upon the record in the course of the hearing that I fully accepted Officer Stanley's unrebutted straight-forward testimony—without reservation.

Thereafter, Customs did not receive a formal application from BBT; and Gallagher blandly admitted that BBT ceased further efforts to obtain a license, content for BBT to operate under CHL 1777 without authorization.

Surely then, in 1977, Gallagher was aware that BBT was empowered to apply for and hold its own license, yet BBT attempted to unilaterally expropriate CHL 1777. It should be observed too that Stanley was explicit that a "green light" was never given by him authorizing BBT to use CHL 1777.

Citing *Portmann v. United States*, 674 F.2d 1155 (7th Cir. 1982), BBT seeks to apply the doctrine of equitable estoppel as an independent and alternative basis for granting it relief. The essence of BBT's claim is that it relied upon alleged misrepresentations of long-gone Customs officers to its detriment, and hence was prevented from obtaining its own license.

Assuming, *arguendo*, that equitable estoppel could be applied against the government in this case (see *Air-Sea Brokers, Inc. v. United States*, 66 CCPA 64, C.A.D. 1222, 596 F.2d 1008 (1979); *Eddietron, Inc. v. United States*, 84 Cust.Ct. 158, C.D. 4853, 493 F.Supp. 585 (1980)), it is nevertheless clear that BBT has failed to establish the essential factors to support an estoppel. As the Court of Appeals succinctly spelled out in *Portmann*, 674 F.2d at 1167, quoting from *TRW, Inc. v. Federal Trade Commission*, 647 F.2d 942 (9th Cir. 1981), those fundamental factors are:

First, the party to be estopped must know the facts. Second, this party must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury.

Plaintiff BBT has failed to establish even one of the requisite four factors. Regardless of what Gallagher insisted that he had previously been told, the credible evidence of record establishes that BBT was officially advised in 1977 by Customs that BBT's own license would be available only after a routine application and investigation. Obviously, BBT simply declined to apply. Rather, it continued to operate as unlicensed under the guise of CHL 1777. No leap in illogical reasoning could ·ever twist this calculated conduct by BBT into an estoppel against the government.

Recently, on June 29, 1982 BBT was notified that Customs had rejected its application for its own license. Plaintiffs have filed an amendment to that portion of the complaint, viz., the fourth cause of action, challenging Customs' denial respecting BBT. The amendment reflects the supervening event of the denial and plaintiffs have requested an expeditious trial of the new cause of action. Additionally, plaintiffs request a continuance of the TRO until the trial date. I shall not grant either of these requests.

Without dwelling on whether this new cause of action should have been raised by an amended or supplemental pleading under Rule 15, I shall deem such pleading a supplemental complaint despite the "amended complaint" label applied by plaintiffs. See *Teeval Co. v. United States*, 88 F.Supp. 652 (S.D.N.Y.1950); *United States v. International Business Machines*, 66 F.R.D. 223 (S.D.N.Y.1975).

■ Plaintiffs seek to introduce an entirely new cause of action into a case that has been extensively litigated and is ripe for resolution of the matters that have been submitted for decision. Under all the circumstances, the introduction of the new license matter is untimely and improper. See *Ataka America, Inc. v. United States*, 80 Cust.Ct. 132, C.D. 4745 (1978).

However, rather than strike the supplemental pleading for untimeliness as urged by defendant, in the interest of judicial economy and expedition I shall sever the amended Fourth Cause of Action from the remainder of the case for a separate trial and disposition. Defendants will have twenty days from the date of entry of this order to interpose an answer or appropriate motion in the severed action. Defendant's motion to dismiss the new cause of action for lack of jurisdiction is denied without prejudice to renewal in response to the supplemental complaint in the severed action.

Finally, I shall vacate the TRO, and deny BBT's motion to continue such TRO until resolution of the new matter in the supplemental complaint. In short, BBT has never possessed a customhouse license, and under these circumstances continuance of that TRO to allow BBT to operate without license, for even a limited time, would be an unwarranted interference with the lawful exercise of executive authority. BBT cannot be permitted to haul bonded cargo without a bond and license in contravention of governmental regulation.

## SEVERANCE AND TRANSFER

On April 28, 1982 this entire matter was transferred to this Court, in accordance with 28 U.S.C. 1584(a), from the United States District Court for the District of New Jersey. That Court presciently foresaw that a retransfer of certain causes of action from the Court of International Trade to the District Court upon jurisdictional grounds might be provident, and entered *its* transfer order, without prejudice to retransfer.

Prior to submission of the license nullification issue defendants moved, without objection by plaintiffs or intervenor, to retransfer to the New Jersey District Court those branches of the case concerning: 1) Customs' seizure of BBT's truck tractor— also claimed by the intervenor; 2) plaintiffs' claims for money damages against the United States; and 3) charges of alleged tortious conduct on the part of the individually named defendants—all of which are set forth in plaintiffs' Fifth through Eleventh Causes of Action of the complaint.

■ 1) Since plaintiff BBT has not alleged that the issues concerning the owner-

ship and seizure of its truck tractor arise out of the administration or enforcement of any law respecting revenue from imports (see 28 U.S.C. § 1581(i)(1) and (4)) or arise out of any administrative action by Customs that is reviewable by this Court, plaintiffs' cause of action respecting the seizure of BBT's truck tractor fall within the jurisdiction of the district court, and therefore is severed and retransferred to the United States District Court for the District of New Jersey.

2) Claims for money damages for asserted injury or loss of property caused by the alleged tortious acts of government employees are, pursuant to 28 U.S.C. § 1346(b) (the Federal Tort Claims Act), within the exclusive jurisdiction of the District Court. Those actions not sounding in tort fall within the concurrent (but exclusive of the Court of International Trade) jurisdictions of the District Court and the Court of Claims. Since the Court of International Trade has no jurisdiction over these tort claims, they are severed and retransferred to the United States District Court of the District of New Jersey.

3) Likewise, the statutory basis of jurisdiction of the causes of action relating to the alleged tortious conduct of the individually named defendants is found in 28 U.S.C. 1331(a), which expressly places jurisdiction in the United States District Court. The United States Court of International Trade, obviously, lacks jurisdiction and these claims are severed and retransferred to the United States District Court of the District of New Jersey.

Consequently, the causes of action relating to: 1) the seizure and ownership of BBT's truck tractor; 2) money damages against the United States; and 3) alleged tortious conduct of the individually named defendants set forth in the Fifth through Eleventh Causes of Action in the complaint, are severed and retransferred to the United States District Court for the District of New Jersey.

## CONCLUSION

In accordance with the foregoing, it is determined and ordered that:

1) Plaintiff Bar-Mar Warehouse Co., Inc. is declared the *de facto* and sole holder of customhouse license # 1777. Customs' action in declaring CHL # 1777 to be null and void is contrary to law and defendants are enjoined from taking any further action against Bar-Mar Warehouse Co., Inc. to effectuate such nullification on the basis of any past revocation or repeal of Bar-Mar Warehouse Co., Inc.'s corporate authority by the State of New Jersey. The United States Customs Service and the Area Director of Customs, Newark area, New York region are hereby directed to deliver forthwith to Bar-Mar Warehouse Co., Inc., as licensee, a license certificate; and trucker's identification cards, if requested by Bar-Mar Warehouse Co., Inc.

2) The application of Bar Bea Truck Leasing Co., Inc. for declaratory and injunctive relief is in all respects denied, and the temporary restraining order is dissolved. (See paragraph 4 infra.) Bar Bea Truck Leasing Co., Inc. and its officers, agents and employees are hereby permanently enjoined from operating as a licensed customhouse cartman under the authority of CHL # 1777 or any customhouse license issued to any individual or corporation other than BBT itself.

3) Plaintiffs' supplemental Fourth Cause of Action is severed for separate trial. Defendants will have twenty days from the date of the entry of this order to file a responsive pleading or motion.

4) Plaintiff Bar Bea Truck Leasing Co., Inc.'s motion for a continuation of the TRO pending a trial of the Supplemental Fourth Cause of Action is denied.

5) The Fifth through Eleventh Causes of this action are severed and retransferred to the United States District Court for the District of New Jersey.