**AIR CARGO SERVICES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 85–11–01675.**

United States Court of International Trade.

Jan. 13, 1988.

Krupnick & Goldman (Sheldon M. Krupnick and Charles Holster, Garden City, N.Y., on the brief and at the argument), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office (Florence M. Peterson, New York City, on the brief and at the argument), for defendant.

RAO, Judge:

This civil action involves the denial by the United States Customs Service (Customs) of an application for a license to operate a container station near JFK International Airport, New York. It is before the Court on defendant's motion to dismiss, or alternatively, for judgment on the administrative record, and plaintiff's opposition thereto.

Plaintiff is a domestic corporation having three principals: Anthony Evangelista, Frank Pomponio and Paul Oike. Mr. Evangelista currently operates Sumo Container Station, a separate entity, under a license issued to him by Customs in 1978. He is the president and sole shareholder of Sumo.

At the time that plaintiff corporation applied for the license, it had not been capitalized nor commenced doing business. Customs did a background check on the principals, which disclosed that Mr. Evangelista had rehired one William Sharrocks on his release from federal prison. Sharrocks had been found guilty of possession and conspiracy to distribute marijuana as a result of a Drug Enforcement Administration (DEA) investigation at JFK Airport, which involved the unloading of restricted substances at or near the Sumo Container Station, as well as transactions involving the smuggling of millions of dollars worth of illicit drugs through airline freight facilities and Customs licensed container facilities. Customs also investigated one Donald Brown, who had testified under oath that approximately 11,000 pounds of marijuana had been unloaded at the Sumo warehouse. Sharrocks had also admitted under oath to unloading drugs at the Sumo warehouse.

After counsel for plaintiff met twice with Customs officials to discuss the application for the container station license and in August, 1984, Customs informed plaintiff's counsel that the license would be denied, based on the results of the investigation. Plaintiff, through counsel, requested an opportunity to file additional written submissions, including affidavits. Customs commenced a second investigation based on plaintiff's submissions, and on the basis of its findings, formally denied the application. Subsequently, Customs also denied a further request for a formal conference to discuss the denial.

This civil action followed, plaintiff claiming that the processing of the application for a container station license was accomplished in derogation of the Administrative Procedure Act and of the due process clause of the Constitution. Plaintiff also claimed that the drug transaction that was the subject of the DEA investigation did not occur on Sumo premises, and that the denial of the application was arbitrary, capricious and without substantial basis in fact.

Defendant claims that the Court of International Trade lacks jurisdiction over the subject matter of the action, that plaintiff has failed to state a cause of action and alternatively, that the denial of the license application was based on thorough administrative review and was not arbitrary, capricious or unsubstantiated by the facts.

## I.

### JURISDICTION

Plaintiff's jurisdictional claim is under 28 U.S.C. §§ 1581, 2201 and 2202 and under 5 U.S.C. §§ 701, 704 and 706. Without reviewing each of these provisions, this Court decides that jurisdiction exists pursuant to 28 U.S.C. §§ 1581(i)(1) and 1581(i)(4). Section 1581(i) states that this Court possesses jurisdiction over an action that arises out of any law of the United States providing for:

(1) revenue from imports or tonnage;

(2) tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue;

(3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the

protection of the public health or safety; or

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

Although there is no express statutory authority for Customs to regulate or license container stations, the provisions of 19 U.S.C. § 66 grant Customs (through the authority of the Secretary of the Treasury) the power to prescribe "rules and regulations not inconsistent with law, to be used in carrying out the provisions of law relating to raising revenue from imports, or to duties on imports, or to warehousing and shall give such direction to customs officers and prescribe such rules and forms to be observed by them as may be necessary for the proper execution of the law."

A thorough analysis and review of Congressional intent and the legislative history of § 1581(i)(1) and (4) was given in *DiJub Leasing Corp. et al. v. United States*, 1 CIT 42, 505 F.Supp. 1113 (1980), and in *Bar Bea Truck Leasing Co. v. United States et al.*, 4 CIT 104 (1982) [Available on WESTLAW, 1982 WL 2235], cases involving the revocation of a cartman's license (*DiJub*) and the denial of an application for a cartage license (*Bar Bea Truck*) and we adopt the reasoning in those decisions in concluding that the rational expressed in those cases is equally applicable here, especially the following:

The rationale expressed above by the House Committee on the Judiciary for reposing jurisdiction in the Court of International Trade of actions involving customhouse brokers' licenses is equally apposite to actions contesting the revocation of a cartman's license.

Since the primary purpose of licensing cartmen is for the protection of the governmental revenue from imports, this action arises out of the administration and enforcement with respect to a law of the United States providing for revenue from imports within the purview of 28 U.S.C. §§ 1581(i)(1) and (4). Consequently, while the doctrine of expressio unius exclusio alterius would plainly exclude cart-

men's license proceedings from 28 U.S.C. § 1581(g), that doctrine does not preclude this court's jurisdiction to review the revocation of such licenses pursuant to the residual grant of jurisdiction in section 1581(i). *Bar Bea Truck, supra* at 104, 105.

The Court decides that the primary purpose of licensing container stations is for the protection of governmental revenue from imports and that the instant action arises under 28 U.S.C. § 1581(i).

## II.

### MERITS OF THE CLAIM

■ The Court next considers whether the denial of the cargo container station application was proper and in accordance to law. The parties agree that there are no statutes or regulations which set standards to be applied in the consideration of these types of license applications. Accordingly, the standard of review to be applied is whether the agency action was arbitrary, capricious or otherwise unlawful. For the following reasons, the Court determines that Customs' denial of the license application was lawful.

There was ample sworn testimony and other evidence that the Sumo warehouse had been used as a "drop" for narcotics smuggling during the DEA investigation at JFK Airport. Even though Mr. Evangelista was not found personally to be chargeable with any crime, it can be concluded that illegal activities were conducted on Sumo premises (ostensibly without Mr. Evangelista's knowledge) and no representations were made to Customs that additional security measures would be taken so that such activity would not occur at the Air Cargo premises. If similar management techniques were to be employed, it is possible that similar activities might occur at the container station contemplated in the application.

The Court refrains from drawing conclusions on the wisdom of Mr. Evangelista's decision to hire William Sharrocks on his release from prison. Standing alone, the decision to employ a person who has paid

his debt to society and is seeking rehabilitation through honest employment would commend Mr. Evangelista. However, since the employment could place William Sharrocks in situations involving duties and breaches similar to those at Sumo, Custom's action in giving negative weight to Mr. Evangelista's willingness to reemploy Sharrocks, if such reemployment could result in additional breaches of security, was justified.

Each of the affidavits submitted by plaintiff in its second submission in support of the license application attempts to put the marijuana "drop" at a vacant lot adjacent to the Sumo installation rather than on Sumo premises. However, this sworn testimony conflicts with sworn testimony of both Donald Brown and William Sharrocks at pretrial depositions and during trial, and details of that testimony were not refuted in the submitted affidavits. For example, Donald Brown testified on two occasions that on the night of the "drop" at Sumo he called Sharrocks inside the Sumo warehouse, using a code name, to inquire as to how long the transfer of the marijuana would take. This testimony was not believably contradicted in the supporting affidavits except for a statement that the call had been placed to Brown from an unidentified pay phone on a cold, sleety night when Brown was at the Owl Tavern, in close proximity to the Sumo locale.

Mr. Evangelista's sworn testimony is to the effect that he was not at any time aware that he or Sumo was under investigation with respect to drugs and that he was advised by Customs to terminate Mr. Sharrock's employment. Both these statements are refuted by the Customs special agent in charge of the investigation who stated that Mr. Evangelista was questioned at length by DEA agents and was even read his "*Miranda* rights" with respect to the questioning. Senior Special Agent James Coble also stated that he believed that he and Special Agent Andre Flores were the only contacts from Customs that Mr. Evangelista had with respect to Sharrock's employment and that neither of them had suggested or demanded that Sharrocks be fired.

The supporting affidavits also attempt to establish that the "drop" had been made on a vacant lot adjacent to the Sumo premises via a statement to the effect that if the truck had indeed backed into a loading dock at Sumo, the cab portion of the truck would have protruded into the roadway, causing a hazard to walkers in the area. It seems highly improbable that a loading dock, which presumably is often used to unload large trucks, would be built in such a manner that when in use, it would impede other traffic.

Although each of these factors, taken alone, might not constitute sufficient ground for the denial of the application, it is the decision of this Court that these factors, and particularly the inconsistencies in the sworn testimonies concerning the location of the marijuana "drop", could lawfully lead Customs to conclude that, in protection of the governmental revenue, the license application should be denied. In cases where the Court reviews the agency decision for legality, the Court does not substitute its judgment for that of the agency, but decides whether the agency record contains sufficient facts to support the agency action. The Court decides that in this case, the administrative record supports the agency action.

Therefore, upon consideration of the parties' submissions, the administrative record, upon all papers and proceedings had herein and upon due deliberation, it is hereby

ORDERED, ADJUDGED AND DECREED that defendant's motion be, and is granted and that this action be and hereby is dismissed.